**UNITED STATES of America,
Plaintiff,**

v.

**Mark Kenneth FRANK, d/b/a M. K.
Frank Iron and Steel Products
Co., Defendant.**

United States District Court
S. D. New York.

April 17, 1963.

Robert M. Morgenthau, U. S. Atty., Anthony J. D'Auria and Robert E. Kushner, Asst. U. S. Attys., of counsel, for United States of America.

Milton B. Pfeffer, New York City, for defendant.

LEVET, District Judge.

Plaintiff, as assignee of Nickel Processing Corporation of New York, sues to rescind a contract of sale and recover the purchase price of certain splice angle bars. Plaintiff's assignor requested a quotation, defendant entered a bid, a written contract was executed, the goods were delivered, shipped to Cuba and then rejected as not being within the "specifications." Plaintiff now seeks recoupment of the purchase price plus the freight charges paid. The principal issue relates to the interpretation of the written contract in respect to the specifications of the goods ordered. The action is brought pursuant to Title 28 U.S.C. § 1345.

After having heard the testimony and proof of the respective parties and having examined the pleadings, the proposed findings of fact and conclusions of law submitted by the parties, I make the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. The United States at the time of the contract hereinafter mentioned, through the General Service Administration (GSA) owned a nickel mine in Nicaro, Oriente Province, Cuba. (4) [1]

2. Nickel Processing Corporation of New York (Nickel) operated and managed the nickel mine as agent and interim contractor for the United States. Although actual operation of the mine was delegated to Nickel, GSA representatives exercised supervision and control over the entire operation. GSA representative, Leo A. Slaughter, was stationed at Nickel's administrative offices in New York. (4, 18) His function was to assist in the preparation of and give approval to various purchases made by Nickel and expenditures for said purchases. (5, 6)

[1]. Unless otherwise specified, all references are to stenographer's minutes taken at the trial.

3. In 1957 it became necessary to extend and repair the railroad on the said mining site in Cuba. (7) On May 28, 1957, Nickel sent a Request for Quotation on certain railroad equipment to defendant M. K. Frank Iron and Steel Products Company (Frank). A Request for Quotation was also sent by Nickel to Bethlehem Steel and United States Steel Company. (Ex. 1; 9)

4. The request called for bids on both rails as well as splice angle bars, although shortly after the request was sent the bid for rails was cancelled. (Ex. 1; 10–11)

5. The request included the following statements: "1000 Pair BARS, Splice Angle for A.R.E.A. 100 lb. Rails, made in accordance with American Railway Engineering Association [AREA] Specification for High Carbon Open-Hearth Steel" and "168 ea RAILS A.R.E.A., 100 lb per yard, 39 ft. long each to be rolled in accordance with Standard specifications with American Railway Engineering Association for Open-Hearth Carbon Steel Rails." (See Ex. 1)

6. On or about June 4, 1957, in response to the request, defendant submitted a bid (Ex. 2) which read in part as follows: "1000 Pair BARS, Splice Angle for A.R.E.A. 100 lb. Rails, made in accordance with American Railway Engineering Association Specification for High Carbon Open-Hearth Steel, 22″ long $5.50 pair."

### THE ORDER CONTRACT

7. On or about October 31, 1957, the defendant was awarded the contract. (Ex. 3)

8. The order contract provided for 850 pair of splice angle bars at a total price of $4,675.00, F.A.S. New York, terms, net cash.

9. The order contract described the splice angle bars as follows: "Bars, Splice Angle for A.R.E.A. 100 Lb. Rails, made in accordance with American Railway Engineering Association Specification for High Carbon Open-Hearth Steel, 24″ long. 850 pr 5.50 pr 4675.00." (Ex. 3)

10. A notice also appeared on the face of the order contract which provided: "NOTE: All material not meeting above specifications will be returned with all costs for your account."

11. The order contract (Ex. 3) contained the following provision binding upon the parties:

"2. QUALITY & INSPECTION— All material furnished on this order must be as specified and regardless of whether any specifications is given, said material shall be of a standard quality as understood to the trade, and all material will be subject to inspection and approval of Buyer after delivery, notwithstanding prior payments to obtain cash discount. The right is also reserved to reject and return at the risk and expense of the supplier, for full credit, such portion of any shipment which may be defective or fail to comply with specifications, without invalidating the remainder of the order. If rejected, material will be held for disposition at the expense and risk of Vendor, and such material is to be replaced only at Buyer's option." (Ex. 3)

### AREA SPECIFICATIONS

12. AREA is an internationally recognized organization of railway engineers, the function of which is to provide standards for and promote uniformity in the manufacture and use of railroad equipment. (62, 63) It conducts studies and publishes a comprehensive Manual of its findings and words (63) in a loose-leaf format with annual additions (63, 69), which is used by railroads and suppliers in the purchase and sale of railroad equipment. (66; see Ex. 6) It is used and referred to in Europe, South America, Canada and Mexico. (66)

13. AREA has no compulsory powers and cannot enforce its standards. (64) The Manual on its title page is called "Manual of Recommended Practice" (65) and this term embraces the specifications of rails contained in Chapter 4. (Ex. 6, p. i; 65)

14. The term "Specifications" is not a word of art or emphasis. The AREA considers the term "Specifications" to apply to all of its standards contained in the chapter on rails (Ex. 6), even though part 2 of that chapter is specifically designated "Specifications" and part 1 is not so designated. (See testimony of Chief Metallurgical Engineer of AREA where he considers the specifications of AREA to apply to the dimension of drillings on rails and bars: 68–9, 70, 71–2, 74–5, 80–2, 84)

15. AREA specifications for the dimension of drillings on 100 pound rail are contained in Part 1, Chapter 4, page 4–1–14 of the Manual. (Ex. 6; 80–2) AREA specifications for the dimension of drillings on bars are contained in Part 1, Chapter 4, page 4–1–14 of the Manual. (Ex. 6; 80–2) The Manual at that page provides that the drillings should be separated by a space of 5½ inches. (Ex. 6; 74–5, 80–2; see also Ex. 8)

16. Splice angle bars are designed to couple two sections of rail. As the rails are joined the bars are placed to the sides of both sections. In order to attach the bar to the rails there are drillings (holes) of equal distance on both the bar and the rails permitting the insertion of a bolt and nut. (68, 110) Should there be any variance between the spacing of the drilling on the bar and the drilling on the rails, alignment of the bar is impossible. (68, 110) Splice angle bars have no independent use of their own and their only function is to be mated with rails. (68, 110) It is conceded that the bars shipped by defendant contained drillings with spacing of only 5 inches. (59) The bars were accordingly useless to plaintiff since they could not fit the 100 pound AREA rail for which the bars were ordered. (81, 83) (See also Ex. 8)

17. AREA has only one specification for the spacings of drillings on bars and rails and that is contained on page 4–1–14 of the Manual. (73–4, 80) With respect to the dimensions of the drillings, the rails for which the subject bars were intended were adequately described in the contract. With respect to the dimensions of the drillings the bars were adequately described in the contract.

DEFENDANT'S KNOWLEDGE OF AREA SPECIFICATIONS

18. Defendant, through its managing agent, David T. Williams, was well acquainted with AREA specifications. The facts supporting this finding are as follows:

Williams has been in the business involving railroad track equipment since 1926. (105–6)

Williams admitted that he was perfectly familiar with dimensions of rails and with the drillings in bars and in the ends of rails (106) and that he had measured such drillings many times. (107) He also admitted that he had purchased splice angle bars and sold splice angle bars by the thousands as well as rails. (108–9) He knew the sole function of splice angle bars was to be mated with the rails and that the dimensions of the drillings vary. (109–10)

Williams stated that he had a copy of the AREA Manual in his office, or at least parts of it, including the part referring to rails. (119–20) He stated he knew all the AREA specifications by heart but he had to refer to the Manual (120), although it was not necessary to refer to the Manual. (121) When they received the purchase order, he referred to the AREA Manual. (121) They used the Manual every day. (122)

Before he responded to the bid, he looked in the Manual to find out the specifications for the bars, although the bars which he had on hand had dimensions of 5″ drillings. (123–25) He did have bars with 5½″ drillings made in accordance with specifications of AREA. (125–26)

The reason he submitted the bid on the bars with 5″ drillings was that they had a certain specific quantity and because they were in Newark, New Jersey, ready for immediate shipment. (126–27)

He never asked McKeag or McDonald, representatives of Nickel, what dimensions they wanted in the splice angle bars, although he had many conversations concerning the bid. (96, 127, 128)

Williams knew when he drew up the invoice for the bars that the bars were to fit 100 pound AREA rails. (153) Apparently he contended that if someone had a 5½″ rail and he was shipped a 5″ splice angle bar, these bars could be used to join the rails by elongating the holes in the rails, which required drilling new holes on the rails. (155)

## INSPECTION

19. There was no inspection or acceptance of the bars by Nickel at Newark, New Jersey. The facts in reference to McDonald's visit to Newark are as follows:

In November of 1957 John McDonald was employed by Nickel as a junior buyer. (178-9) He was 25 years old and had had no experience in the purchase and sale of railroad equipment. (178-9)

At the direction of his superior he was directed to visit defendant's warehouse to see its layout and begin his training in railroad equipment. (179) At the time of his visit, McDonald had never seen a splice angle bar and did not know its function. (180)

McKeag, his superior, was not authorized to direct McDonald to inspect and/or approve any items of the contract. McDonald was not authorized by McKeag to inspect and/or approve the goods. (175-6)

McDonald did not go to defendant's warehouse with a ruler or diagram (180) and the subject of spacing on drillings was never discussed with or by Williams. (138)

20. The defendant delivered the bars to the pier in Brooklyn, New York on November 13 and November 15, 1957 and from there were shipped to Cuba, where they arrived on December 3, 1957.

## RESCISSION

21. After the bars reached Cuba they were placed in Nickel's railroad yard. (18)

22. Williams conceded that on January 20, 1958, McKeag stated that the bars had arrived in Cuba, that they wanted 5½″ drillings, that the bars shipped were not of that drilling, and that he was requested to take back the bars and make replacement. (147)

23. Williams knew by February 4, 1958 that the dispute referred to AREA specifications and recommendations concerning splice angle bars. (148-49)

24. On or about March 7, 1958, Nickel, by A. C. Moore, Office Manager, wrote in part to the defendant as follows:

"As we have already advised you, we are holding at our plant at Nicaro, Cuba, your shipment of 850 pair Bars Splice Angle for 100-pound rails covered by your invoice to us of November 11, 1957, in the amount of $4,675.00.

"This shipment has failed to meet the terms and specifications of our purchase order of October 31, 1957, reference MXP-94, Y-14792, Y-14901, reading: 'made in accordance with American Railway Engineering Association Specification for High Carbon Open-Hearth Steel, 24″ long'.

"Since we paid your invoice against bill of lading without knowing that the shipment failed to meet our requirements, you, of course, owe us the $4,675.00 costs involved plus our shipping charges to Nicaro and unloading expenses of $1,206.26. Our covering invoice, No. AA-73, is attached.

"Additionally, our purchase order accepted by you specified: 'All material not meeting above specifications will be returned with all costs for your account'." (Ex. 5)

25. Defendant was not in any way prejudiced by the lapse in time, from delivery to notice of rejection.

## THE CASTRO EXPROPRIATION

26. Defendant never contacted Nickel or plaintiff or expressed any concern for the bars. (158-60, 171)

27. The entire mining site, including the bars, was expropriated by Fidel Castro on October 24, 1960. (Ex. 4)

28. The value of the equipment and nickel seized exceeded 99 million dollars. (22-3)

29. The expropriation was not occasioned by any act or failure to act on the part of Nickel.

30. The reasonable price of the angle bars on March 7, 1958 and on the date of the expropriation decree, October 24, 1960, was said by Williams to be $5.50 a pair. (156-57)

31. The defendant never communicated with the plaintiff or plaintiff's assignor with respect to the disposition of the bars after March 7, 1958 and never made any arrangements to get the bars from Cuba. (158-59)

32. When Fidel Castro's revolutionary government took over Cuba, defendant did not become concerned for the splice angle bars or write to Nickel to get the bars out and did nothing after Castro took over. (159-60)

33. Prior to the commencement of this action and on or about March 10, 1959, Nickel duly assigned to plaintiff all its right, title and interest in and to any claim or cause of action which Nickel might have against defendant arising out of said purchase order. (See Ex. 12)

34. The parties agreed that the costs incurred by plaintiff in shipping the splice angle bars to Cuba were $1,206.25. (Joint Pre-Trial Memorandum, January 1962)

## DISCUSSION

This case involves a simple question of the interpretation of a written contract. As indicated by the Findings of Fact, the contract contained adequate information upon which the defendant was required to act.

It is evident that defendant did not comply with the terms of the contract. The defendant, however, defends on four theories. First, the bars did meet AREA specifications; second, the plaintiff inspected the bars at Newark, New Jersey and did not reject them as non-conforming; third, the plaintiff did not notify the defendant of its rescission within a reasonable time; fourth, assuming the rescission was valid, plaintiff, as bailee, failed to exercise reasonable care of the bars.

## AREA SPECIFICATIONS

There is no doubt that the bars did not meet AREA specifications. The claim by defendant that the bars did meet the specifications, except for the holes, is clearly frivolous. In this connection, defendant argues that the space between drillings of the bars is not a "specification" of AREA, but only a recommendation, and that the contract required conformity to specifications, not recommendations.

The above contention is without merit. (See Findings of Fact Nos. 12-15) This construction of the contract, even if valid, was not that considered by the parties when they contracted. Both parties are businessmen and it is clear beyond doubt that the contract unequivocally referred to the AREA standards for bar drillings.

■ It is proper for a court to consider how terms are used in a particular industry. Thus, in Arnold Productions, Inc. v. Favorite Films Corporation, 298 F.2d 540 (2 Cir. 1962) the court stated:

"The contract must be interpreted in light of what the record reveals about the practices of the business in which the parties were engaged, and especially what it reveals about the general understanding and course of dealings between them." (298 F.2d p. 543)

See also Murphy v. Warner Bros. Pictures, 112 F.2d 746 (9 Cir. 1940); Machen v. Johansson, 174 F.Supp. 522 (S.D.N.Y.1959).

Thus, this court is justified in considering the contract terms from the point of view of a reasonable business man in the railroad supply business. As Judge Learned Hand said:

"[I]n ascertaining what meaning to impute, the circumstances in which the words are used is always

relevant and usually indispensable. The standard is what a normally constituted person would have understood them to mean, when used in their actual setting." N. Y. Trust Co. v. Island Oil & Transport Corp., 34 F.2d 655, 656 (2 Cir. 1929).

See also Hammond Ford, Inc. v. Ford Motor Company, 204 F.Supp. 772 (S.D. N.Y.1962).

■ Therefore, used in its customary way, "specification" means "design" or "standard" in this instance. (See Findings of Fact Nos. 12–15)

In view of the defendant's extensive business in railroad supplies, he cannot deny what the custom of the trade or understanding of a reasonable business man is as to AREA specifications.

## INSPECTION

■ It is clear that there was no inspection at Newark, New Jersey. It is also equally as clear that plaintiff had the right, pursuant to the contract, to inspect the bars after they arrived in Cuba to determine if they complied with AREA specifications. (See Finding of Fact No. 11) Glass & Co. v. Misroch, 239 N.Y. 475, 147 N.E. 71 (1925); Delaware, Lackawanna & West. R. Co. v. United States, 231 U.S. 363, 34 S.Ct. 65, 58 L.Ed. 269 (1913); Reichel v. Standard Rice Co., 254 N.Y. 86, 171 N.E. 916 (1930). They exercised this right and found that the bars did not comply.

## NOTICE OF RESCISSION

■■ Correlative to the right to inspection is the duty to make the examination as soon as reasonably possible and then to notify the vendor of its election. From the facts before me, it is evident that plaintiff did promptly inspect the goods and notify the defendant in a reasonable time of its decision to rescind the contract. Pierson v. Crooks, 115 N.Y. 539, 551, 22 N.E. 349, 352; Mason v. Smith, 130 N.Y. 474, 29 N.E. 749. Williams admitted that he knew as early as January 20, 1958 that Nickel found the bars unsuitable. (145–48) No proof of any prejudice by reason of any delay was adduced by defendant.

## THE CASTRO EXPROPRIATION

■ It was conceded that defendant never once communicated to Nickel or plaintiff with respect to the bars. The defendant, rather than plaintiff, abandoned the bars. (158, 160, 171) Defendant claims that plaintiff as bailee neglected its duty of reasonable care in allowing the bars to fall into Castro's hands.

Defendant has the burden of proof of establishing negligence. Without passing upon the duty of care owed by a bailor to a bailee, under the circumstances of this case, defendant has failed to carry his burden. Claflin v. Meyer, 75 N.Y. 260; Castorina v. Rosen, 290 N.Y. 495, 49 N.E.2d 521. If anything, the record reveals that defendant was contributorily negligent in permitting the bars to remain in Cuba for an extended period of time.

## CONCLUSIONS OF LAW

■ 1. Title to the bars preliminarily vested in Nickel at the time of their delivery to the pier in New York. Nickel had, however, a right to revest title upon inspection of the bars in Cuba.

2. The bars were not in accord with the contract requirements.

3. Nickel seasonably exercised its right to reject the bars, revest title in defendant, rescind the contract and sue for damages.

4. Accordingly, plaintiff is entitled to judgment in its favor in the sum of $5,881.26, consisting of $4,675.00 contract price and $1,206.26 shipping charges, together with costs and disbursements of this action. The question of interest is reserved until the signing of judgment and counsel are directed to submit memoranda on this question with their proposed judgments.

Settle judgment on notice.