Eddie MACHEN, Plaintiff,

v.

Ingemar JOHANSSON, Defendant.

United States District Court
S. D. New York.

June 9, 1959.

Engelman & Hart, New York City, by Jack Hart, New York City, of counsel, for plaintiff.

Goldstein, Golenbock & Barell, New York City, by Justin M. Golenbock and Ben Herzberg, New York City, of counsel, for defendant.

IRVING R. KAUFMAN, District Judge.

In this action tried to me without a jury the plaintiff seeks to enjoin the defendant from engaging in a boxing match with Floyd Patterson, the heavyweight champion of the world, scheduled to be held in New York City on June 25, 1959, approximately two weeks from

today. He asks that this injunction continue until the defendant shall have engaged in a return boxing match with the plaintiff.[1]

Plaintiff's claim for an injunction is grounded upon the contention that the defendant had agreed to a rematch with the plaintiff and had also agreed not to engage in any fights in the United States and specifically not to fight Floyd Patterson anywhere in the world before the rematch with the plaintiff had been held. At this juncture a brief statement concerning the factual contentions is in order.

In 1958 and until September 14, 1958, the plaintiff was recognized by the National Boxing Association and "Ring Magazine" (a recognized publication in the boxing world) as the Number One or Number Two challenger for the world's heavyweight title. The defendant was the European heavyweight champion and ranked 6th or 8th.

In the latter part of April, 1958, negotiations for a boxing match between plaintiff and defendant to be held in Sweden were begun between the Swedish promoter Edwin Ahlquist and Eddie Machen's manager, Sidney Flaherty, or his designated agents.

After preliminary negotiations the plaintiff mailed and Ahlquist received a letter dated June 7, 1958, containing plaintiff's terms for a boxing match in Sweden.[2] The letter stated among other things "one of the conditions of Eddie Machen meeting Ingemar Johansson is

[1.] The action also sought a declaratory judgment with respect to the rights and obligations of the parties to an alleged agreement for a rematch but this aspect of the prayer for relief was ignored at the pre-trial hearings and abandoned at the trial.

[2.] "Western Promotions, Inc.
"June 7th, 1958
"Mr. Edwin Ahlquist,
Kungsgatan 5, .
Goteborg, Sweden.
"Dear Mr. Ahlquist:
"Mr. Sven Holmberg has just arrived in San Francisco and we have discussed your letter with him.

"The conditions of your letter with regard to a match between Ingemar Johansson and Eddie Machen are entirely agreeable to us, namely: you guarantee the sum of $20,000.00 with the privilege of 20% of the gross after payment of State tax, in American dollars, the guarantee of $20,000.00 to be paid to our bank in the United States upon our arrival in Sweden. We agree to be in Sweden at least two weeks prior to the date of the match.
"We understand that the match is to be held on August 31st, 1958 which is also agreeable to us.
"The payment to us of the guarantee or percentage which ever is the greater shall be tax free to us.

that should Johansson win then he agrees to a rematch with Machen, said rematch to take place in San Francisco at a date to be agreed upon when we arrive in Sweden."

On June 27th Flaherty telegraphed Ahlquist urging a reply to his letter of

"You agree to furnish us with four round trip air tickets from the Pacific Coast to Sweden and return.

"In addition to the foregoing it is our understanding that there will be both radio broadcast and films taken.

"On the radio, the income to be 33-⅓% each to Johansson, Machen and yourself. On the films, the income to be 25% each to Johansson and Machen and 50% to yourself.

"Mr. Holmberg further advised us that you would like to have training camps set up during the training period at which you would have an admission charge. On this income we understand that, you would retain 50% of the gross income and Johansson and Machen would receive 25% each of the gross income.

"With regard to the income derived from the radio, films and training camps, you are to pay the State income tax deducting same from our percentages.

"If it seems advisable after the match to spend some time in Sweden for exhibition matches, we shall be interested in this and will discuss the terms for this with you when we arrive in Sweden.

"One of the conditions of Eddie Machen meeting Ingemar Johansson is that should Johansson win then he agrees to a rematch with Machen, said rematch to take place in San Francisco at a date to be agreed upon when we arrive in Sweden.

"We would like very much to be able to use the type of gloves which are most used in the United States. These gloves are hand made and we believe they are the best gloves made anywhere. In order that you may know what these gloves are we are shipping you a set for Johansson to try out. Should you feel that these gloves are not acceptable we would appreciate your sending us a set of the type you use in Sweden.

"At this time it is our intention to bring over as a sparring partner for Machen, Howard King, a very good heavyweight who has just had a close ten round fight with Archie Moore.

"We will mail you within a few days some pictures of Howard King.

"Mr. Holmberg mentioned a lightheavy boy in Sweden named, Lennart Risberg,

June 7th. Here, a serious cleavage in the facts develops. Ahlquist insists that sometime between June 12th and 15th, or in that vicinity, he replied to Flaherty advising him that Johansson would not agree to a rematch provision. A copy of the purported letter [3] was produced

can you give us his weight. We have a very good boy who will weigh about 165 to 170, his name is Roger Rouse, a good looking white boy who was on the recent America Olympic team. He has two pro fights so far with capable opponents and has won both. If you feel that we could use Rouse we would be interested in bringing him along.

"With reference to Howard King coming over in our party we would want to have him on the card as one of the prelim matches if it is possible for you to find a suitable opponent.

"We have agreed to bring Mr. Holmberg over to Sweden with us.

"We are sending you this letter in duplicate and request that you sign all three pages showing your acceptance should you agree to the terms as expressed herein.

"We shall appreciate your advising us as soon as possible on this matter so that we can complete our plans here without delay.

"We shall make no statements here as to the match but will leave it in your hands to make the announcement at such time as you feel it should be made at which time kindly cable us that you have announced the match.

"Looking forward to meeting you in August,

"Sincerely

(sd) Fred H. Spiess
for
Sid E. Flaherty

"All matters on this page
agreed to:

Edwin Ahlquist"

[While this notation appeared on each page of the above quoted letter, Ahlquist never signed as requested.]

"Gothenburg June 1958.
"Mr. Sid Flaherty,
Western Promotions,
472 Ellis Street,
San Francisco, Cal.
"Dear Mr. Flaherty,

"Yesterday I recieved a letter of June 7th from mr. Fred Spies, writing in your behalf re the proposed contest between Eddie Machen vs. Ingemar Johansson to

at the trial and it was asserted by Ahlquist that he had prepared the letter in handwriting and then gave it to an employee to type and mail, his regular secretary being absent because of illness. In this letter and in his testimony at the trial Ahlquist insisted that the declination of a return match was the direct result of specific instructions received by him from Johansson.

In a subsequent telegram, dated July 18th, Ahlquist agreed to arrange a contest pursuant "to your terms in previous letter." There was a further exchange of letters ultimately leading to the signing of an agreement, dated August 3rd, between Ahlquist as "promoter" and Western Promotions, Inc., a corporation of which Flaherty was President, as "manager". This document (Exhibit 10–A) does not contain any provisions for a rematch. Plaintiff's explanation is that he did not expect such a provision in a contract between a promoter and plaintiff's manager and, therefore, did not insist upon the provision in this agreement. Ahlquist, plaintiff claims, was acting in two capacities. He urges that by Ahlquist's telegram of July 18th accepting all of the terms contained in the letter of June 7th, defendant had already agreed to the rematch. Plaintiff asserts that Ahlquist was the promoter of the Swedish fight as well as Johansson's manager and agent. Defendant, on the other hand, points to this agreement as containing all of the terms agreed upon and the absence of the rematch provision as indicating that it was never consented to.

The fight between plaintiff and defendant was scheduled to take place on September 14, 1958, in Gothenburg, Sweden. Plaintiff, his manager and party arrived in Sweden in late August 1958. It is plaintiff's contention that on the day of his arrival his manager Flaherty approached Ahlquist with the demand that the details of a proposed rematch be agreed upon and embodied in a writing. Defendant, on the other hand, introduced testimony to show that Flaherty's first demand for a rematch was made in Sweden on September 12th, two days before the fight. It is Flaherty's position that as plaintiff's agent he had reached an agreement, prior to his departure for Sweden, that there would definitely be a rematch in the event of a defeat of the plaintiff at the hands of the defendant; that only details remained to be worked out and that this was what he was attempting to do in his pursuit of Ahlquist during the days immediately preceding the September 14th match. Ahlquist, of course, denies that there was an agreement for a rematch and insists that it had been specifically rejected in his June 1958 letter. He insists that the conduct of Flaherty on the eve of the Swedish bout constituted coercion and duress; that

be staged here in Gothenburg this summer. I agree to the terms mentioned in mr Spies letter except the proposed return match, should Ingemar Johansson win over Machen here. I have spoken to Ingemar and his father about this matter but they are not interested in a return go. I am not however in a position to force Ingemar to accept such a return match, it could well be that have to cansel the whole thing, meaning not staging the contest here.

"I wish to tell you that I have been negotiating two other classy american heavyweights re a fight with Johansson in Sweden.

"In foregoing matter I wish to point out two things:

"1. Eddie Machen being the top contender for the worlds heavyweights title and with a lot of more ring-experience than Ingemar Johansson, whom will make his first bid against a real top man, should win over Ingemar. Therefore I dont think you should worry to much about Ingemar not being interested in a return.

"2. The fight would draw a lot of money here and you and Machen would have a real good payday.

"Therefore I dont think you should trow this chance away for the sake of return in U.S.A.

"Hoping to see you all here in Gothenburg in a couple of months

"Yours cinserely

Edwin Ahlqvist

E. Aqt.

"Kungsgatan 5,

"Gothenburg."

Flaherty threatened that if a rematch provision was not promptly reduced to writing and the terms finalized, he and his fighter would leave Sweden at once and not fight Johansson. It is conceded by Flaherty that he told Ahlquist on September 12th that there might be no fight unless a rematch agreement were signed. This, Ahlquist insists, had catastrophic implications for him since he had invested over a $100,000 as promoter. If the fight were cancelled it would have meant financial ruin for Ahlquist and the end of his reputation as a promoter. In any event, on September 13, 1958, a document prepared by Flaherty [4] was signed by Ahlquist in the room of Sidney Flaherty at the Park Avenue Hotel in Gothenburg, Sweden. The document was witnessed by Olof Ahlsted, a Swedish lawyer, who represented Mr. Ahlquist, and Sven Holmberg.

On September 14, 1958, the fight was held between plaintiff and the defendant, resulting in the surprise knock-out of the plaintiff by the defendant in the first round. As a result of his dramatic victory over Machen, Johansson was immediately thrust into a position of prominence in the boxing world. The November 1958 issue of Ring Magazine stated that, as of September 16, 1958, Johansson was the number one ranked contender, and Machen number five. The National Boxing Association ratings listed Johansson as second and Machen as fifth. On January 29, 1959, after months of negotiations between Johansson, Ahlquist, promoter Rosensohn and Cus D'Amato, manager for Floyd Patterson, an agreement was signed for a match between Patterson and Johansson. These negotiations began the day after Johansson's victory.

Defendant has refused to honor the alleged agreement for a rematch and to recognize the document of September 13th on several grounds: (1) He contends that Ahlquist was never his agent, actual or apparent, and was never given authority to sign this agreement in his behalf, and that Flaherty had been specifically informed that defendant would not agree to a rematch; (2) that the agreement was obtained by coercion and duress; (3) that the agreement for a rematch is void and uneforceable for lack of consideration and is further invalid because its terms are indefinite and uncertain. Other grounds are urged, such as the inability of the International Boxing Club, named in the document of September 13th as the promoter of the rematch, to perform because of its dissolution pursuant to a decree of Judge Ryan in an anti-trust suit brought against it. United States v. International Boxing Club, D.C., 150 F.Supp. 397; 171 F.Supp. 841; 358 U.S. 242, 79 S. Ct. 245, 3 L.Ed.2d 270.

---

4.   "Park Avenue Hotel
                Goteborg
            "Agreement
                        "September 13, 1958
"I, Edwin Alquist, acting as Agent for Ingemar Johansson, with full power of Attorney to sign the following agreements:
"If Ingemar Johansson is the winner of a match to be held on the 14th day of Sept. in Goteborg, Sweden, his opponent to be Eddie Machen, Ingemar Johansson agrees to the following:
"1. A return match of 12 rounds will be boxed in the City of Chicago, Illinois, under the auspices of the International Boxing Club. Said bout will be held during the last week of Jan. or the first two weeks of Febr. 1959.
"2. Ingemar Johansson is to be paid a guarantee of $20,000.00 or 20 per cent whichever is greater, of the gross receits, less state and Federal taxes.
"3. Under separate agreement Ingemar Johansson will be paid a minimum of $7,500.00 or 25 per cent of the television rights, whichever is the greater.
"4. It is also agreed that the International Boxing Club will pay the taxes on the first twenty thousand dollars of the aforementioned guarantee.
"5. It is also agreed that Ingemar Johansson will not box anyone in the United States, and will not box Floyd Patterson under any conditions any place in the world until the above agreements have been fulfilled.
"Olof Ahlsted S. Holmberg
                                Edwin Ahlquist
                                Edwin Alquist "
    Witness

As I have already stated, plaintiff seeks drastic relief by his prayer for an injunction restraining the defendant from engaging in the boxing match with Floyd Patterson now scheduled for June 25th and for a continuance of this injunction until Johansson shall have engaged with the plaintiff in a rematch. I am convinced that the applicable law prevents me, in the light of the facts in this case, from granting the equitable relief sought by the plaintiff. Furthermore, even if such relief could be granted, I would deny the injunction in the exercise of my discretion. I, therefore, find it unnecessary to determine whether Ahlquist had actual or apparent authority to enter into the September writing on behalf of Johansson or to agree to any provisions for a rematch in his behalf. Likewise it becomes unnecessary to decide whether the document of September 13th was extracted by duress or coercion or whether it was based on adequate consideration.

By reason of this disposition it follows also that any alleged violation of Judge Ryan's decree or assertion of a conspiracy to violate the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, need not be dealt with. In short, I make no findings or conclusions concerning the validity of the writing of September 13, 1958, or the enforceability of any part of that writing except the negative covenant contained in paragraph 5 thereof.

Meaning of the Negative Covenant.

Even were I to assume that the writing of September 13, 1958, constitutes a valid agreement between Machen and Johansson for a return fight in the event of Machen's defeat in the September 14, 1958, fight, I would be compelled to hold that Machen is not entitled to the injunction he seeks.

■ It is black letter law that although a contract may be valid it may not necessarily provide the basis for equitable relief. This is not to say that the aggrieved party is left without any remedy. The usual form of redress in cases of breach of contract is money damages. Only in the most unusual case will a court of equity act upon the person of the defendant to restrain him from doing some act which the plaintiff claims may cause him irreparable injury. This is particularly true where, as in this case, the plaintiff seeks to restrain the defendant from freely practicing his trade. His right to this relief must be clear, reasonable and well defined.

■ In order to determine what rights and obligations may flow from the writing of September 13, 1958, I must first determine what the parties intended to achieve by that writing. My task in this case is to examine the words employed by the parties against the background of all of the circumstances under which the contract was drawn. It is only by interpreting the words of others that we may give meaning to their expressions. In the words of Professor Corbin:

"In reading each other's words, men certainly see through a glass darkly; * * * the best that a judge can do is to put himself so far as possible in the position of that person or persons [whose meaning and intention are in issue], knowing their history and experience * * * and then to determine what his own meaning and intention would have been." 3 Corbin, Contracts 13, 23 (1951).

■ So viewing the contract, it is clear on its face that the parties intended to ensure Machen an opportunity to fight Johansson in a return match in the event that Machen lost to Johansson in Sweden. The return bout was to be held in Chicago under the auspices of the International Boxing Club specifically during the last week of January or the first two weeks of February, 1959. No provision was made in the agreement for a postponement or for any alternative time within which the fight was to be held. It, therefore, appears that it was the intent of the parties that Johansson was to have performed the affirmative aspect of the contract by the end of the

second week of February 1959 and that if he failed to do so he would have breached his obligation. As I have already stated, there was included in the writing of September 13, 1958, a negative covenant providing that Johansson "will not box anyone in the United States and will not box Floyd Patterson under any conditions any place in the world until the above agreements have been fulfilled." If plaintiff is entitled to the injunction he seeks, that right flows from this negative covenant. However, while the covenant clearly exhibits an intention to place some restrictions on Johansson's activities as a fighter, it provides me with no clue as to the period of time during which those restrictions were intended to run. The only temporal limitation to be found in the negative covenant is contained in the words "until the above agreements have been fulfilled." The "above agreements" must have reference to the provision relating to the return fight. Thus, the contract is subject to two possible interpretations:

(1) that the negative covenant would run until the time when the return match was scheduled to be held, i. e., no later than February 14, 1959;

(2) that it would run until such time as the return fight was actually held, or until a tender of performance by Johansson was refused by Machen, even if that time ran indefinitely beyond the dates specified in the agreement.

I am compelled to conclude that the parties never intended that the negative covenant run beyond February 14, 1959, the last date for performance of the return bout provision. It may be conjectured that Flaherty was fearful that Johansson, should he defeat Machen and thereby gain a reputation which would be readily saleable in the United States, would not be able to resist the tempta-

tion to exploit that reputation in the months between the original Machen-Johansson fight and the return. Had Johansson engaged in an interim bout and lost, it would have seriously impaired his reputation and thus have detracted from the value of the return bout agreement. This is the eventuality against which Flaherty sought to protect his fighter.

However, plaintiff would have me adopt a different interpretation of the covenant. He now urges that, in contracting to fight Johansson, Machen gave to Johansson "the opportunity to make an important improvement in his competitive position in the boxing world." The instant covenant, plaintiff argues, was intended to prevent Johansson from utilizing his advanced position in competition with Machen until Machen shall have an opportunity to engage him in a return fight. However, a consideration and evaluation of all of the evidence in the case leads me to the conclusion that the interpretation advanced by plaintiff is the less probable of the two possible alternatives.

Under plaintiff's theory, the negative covenant could run on without restriction for an indefinite length of time. This might conceivably be for the remainder of Johansson's life should he never agree to a return match with Machen. Plaintiff concedes that the possible advancement in Johansson's position as a fighter was one of the primary inducements on Johansson's part in entering into the contract for the September 14, 1958, fight with Machen. It is difficult to believe that Ahlquist, if he was acting in Johansson's behalf, or Johansson himself, would ever agree to a contract term which might forever bar Johansson from the beneficial enjoyment of that advanced position.[5]

---

**5.** A further indication that the parties did not intend that the covenant run until a return match was held at some unspecified or unknown time is the utter impossibility of implementing the contract as so interpreted. If defendant was ever to have been free of the restric-

tion, a return bout would have had to have been fought or a proper tender by Johansson refused. Since no time for a postponed return bout is specified in the agreement, the parties would have had to arrive at a date by negotiations. If these negotiations had proved fruitless,

■ I find that plaintiff has failed to establish that at the time the parties entered into the alleged agreement of September 13, 1958, they intended the negative covenant to run beyond February 14, 1959, the last date upon which the return fight was to be held.[6]

### The Injunctive Relief Sought.

However, even were I to conclude that the parties intended to restrict Johansson's right to fight indefinitely and until such time as he would agree to engage

it would have been difficult if not impossible to determine whether either of the parties had failed to bargain in good faith. Yet such a determination would have been essential in order to decide whether Johansson had made such a tender of performance as would entitle him to have the restriction lifted. I cannot accept an interpretation that would deprive the contract of all practical value.

6. I must exclude the possibility that a "reasonable time" was intended. This is a point which was incidentally urged by plaintiff. There is nothing in the agreement to indicate such an intention, nor is any yardstick provided by which a determination of what would constitute a reasonable time might be made. To follow this course would be to rewrite the contract of the parties and supply by judicial fiat an essential term of the contract upon which the parties had no agreement. This a court may not do. Arena Athletic Club v. McPartland, 2d Dept.1899, 41 App.Div. 352, 58 N.Y.S. 477.

7. It must be borne in mind that the citation of "similar" cases is to be distinguished from the citation of controlling authority. We have been admonished on this score by Judge Frank in United Shipyards, Inc. v. Hoey, 2 Cir., 1942, 131 F.2d 525, 526–527:

"[E]lliptical discussions of cases partly alike, as if there were complete identity, is merely for convenience. There is present, although it may be unexpressed, an 'as if', a 'let's pretend'—a simile or metaphor. Such 'as-if' of metaphorical thinking is invaluable in all provinces of thought (not excepting that of science). However, some of the greatest errors in thinking have arisen from the mechanical, unreflective, application of old formulations—forgetful of a tacit 'as if'—to new situations which are suffi-

Machen in a return fight, I would not enforce such a covenant by injunction.

■■ Plaintiff urges upon me that the instant covenant is similar to [7] that category of restrictive covenants ancillary to contracts of employment, where the employee, having gained a professional advantage through the employment, may properly be restrained from using that advantage in such a way as to do serious injury to his employer after the employment has terminated.[8] Plain-

ciently discrepant from the old so that the emphasis on the likeness is misleading and neglect of the differences leads to unfortunate or foolish consequences."

8. Plaintiff has not limited his citations of authority and his arguments to cases involving negative covenants of this type. He has variously sought to place this case within two other categories of negative covenant.

(1) Covenants ancillary to contracts for personal service, involving entertainers, etc., where the services contracted for are unique. Lumley v. Wagner, 1 De.G.M. & G. 604, 42 Eng.Rep. 687 (1852); Harry Rogers Theatrical Enterprises, Inc. v. Comstock, 1st Dept. 1928, 225 App.Div. 34, 232 N.Y.S. 1; Philadelphia Ball Club v. Lajoie, 1902, 202 Pa. 210, 51 A. 973, 58 L.R.A. 227. It is conceded that Johansson's services are unique. However, the rationale underlying enforcement of negative covenants in such cases is that the employer has contracted for the exclusive right to display the entertainer for a given period. That no other entrepreneur may display the particular star during the period contracted for is part of the right for which the employer has bargained. While a court of equity cannot enforce the affirmative aspects of the contract, it will enforce the contract to the extent that it is able. In the instant case, plaintiff has bargained for defendant's services for a very limited and restricted period only. Surely, had the contract been performed, he would not have been entitled to deny defendant the right to perform for others beyond the date contracted for. A breach of the contract cannot broaden his right. Indeed, plaintiff has cited me to no case in which such a covenant has been enforced beyond the period of contracted performance. For cases in which such enforcement has been denied, see Madison Square Garden Corp. v. Braddock, 3 Cir., 1937, 90 F.2d 924; Arena

tiff argues that, by engaging Johansson in the initial fight, he advanced Johansson's professional standing, and that it was, therefore, reasonable for him to restrain Johansson from using that advanced standing to harm Machen.

Defendant, on the other hand, answers that restrictive covenants based upon a promise to refrain from competition are not valid unless they are ancillary either to a contract for the transfer of good will or other property, or to an existing employment or contract of employment. Restatement of Contracts, § 515. Defendant asserts that he was never an employee of Machen's nor was he ever engaged in a transfer of good will.

I need not pass upon the correctness of this proposition of law. I find that the instant covenant even as interpreted by plaintiff is not enforceable by injunction for two reasons:

(1) It is not reasonable in its terms;

(2) The granting of an injunction would inflict serious injury on the defendant, while not providing the plaintiff with the protection he seeks.

(a) *Reasonableness of the terms of the covenant.*

█ Injunctive relief is an extraordinary remedy to be granted sparingly. Worthington Pump & Machinery Corp. v. Douds, D.C.S.D.N.Y.1951, 97 F.Supp. 656, 661. Where restrictive covenants have been enforced they have usually been sharply defined as to time and area. See 9 A.L.R. 1468 et seq. and cases cited therein. While it is true that there are cases in which restrictive covenants, running for the life of the one restrained, have been enforced, in such cases the

restriction extended to a very limited area only. See Fitch v. Dewes, 2 A.C. 158 (Eng. 1921). The instant covenant is extremely broad geographically. It prevents Johansson from fighting anyone in the United States and from fighting Floyd Patterson anywhere in the world. If such a restriction is imposed upon Johansson for an indefinite period of time it would be tantamount to denying him the right to advance himself within his trade or to fight in the United States which, it was testified to, offers the most fertile field for fights. I find that this would constitute an unreasonable restraint.

(b) *The ineffectiveness of the remedy sought.*

Finally there is no way that an injunction could be framed to secure for plaintiff the results he seeks without at the same time placing Johansson under an intolerable restriction.

"Equity not infrequently withholds relief which it is accustomed to give where it would be burdensome to the defendant and of little advantage to the plaintiff." DiGiovanni v. Camden Fire Ins. Ass'n, 1935, 296 U.S. 64, 71–72, 56 S.Ct. 1, 5, 80 L.Ed. 47.

A restriction running for only a limited period would be ineffective. Let us explore this further. Were I to restrain Johansson from fighting Patterson or fighting anyone in the United States for, let us say, one year, he might well return to Sweden, engage in several contests in Europe during the year, and then, upon the expiration of the injunction, again contract to meet Patterson.

Athletic Club v. McPartland, 2d Dept. 1899, 41 App.Div. 352, 58 N.Y.S. 477.

(2) Covenants ancillary to contracts for the sale of a business. Reeves v. Sargeant, 1942, 200 S.C. 494, 21 S.E. 2d 184; Storer v. Brock, 1933, 351 Ill. 643, 184 N.E. 868. The underlying rationale of such cases is that a vendor cannot convey his business, including the good will, to another and then deny the vendee the beneficial enjoyment of what he has purchased by entering into competition with the vendee. In the instant

case, it is plaintiff's position that he has sold good will, or something analogous thereto, to defendant. But, we observe that he is not in the position of vendee but of vendor. I know of no case in which a vendor has been permitted to sell his good will and then place a restriction on the manner in which the vendee may use that good will in competition. Thus, this case is entirely distinguishable from cases involving covenants not to compete with the vendee of a business.

This would neither safeguard Machen's reputation nor secure for him a return match.

Nor would a longer term injunction be satisfactory. Were I to restrain Johansson from fighting for two or three years the damage to him would be very great. He would be unable to advance his position by fighting in the United States during a period that might well represent a relatively large portion of his effective ring career. Yet the benefit to plaintiff from such a restriction would be small. Machen would undoubtedly engage in bouts with other fighters during the period when Johansson was under the restriction. Indeed, he has already engaged in one such fight since his defeat by Johansson on September 14, 1958. Each time Machen fought, the outcome would have an impact, for good or ill, upon his standing as a fighter. These subsequent fights, and not any activity upon Johansson's part, would form the basis of the sports world's evaluation of Machen's abilities. Thus, while it may be argued that at this moment Johansson in effect carries Machen's reputation into the ring with him, this is a situation which will be of but short duration.

In summary, I find that plaintiff has failed on a number of grounds to demonstrate his right to the extraordinary relief he seeks:

(1) There is nothing to indicate that the parties intended that the negative covenant was to run beyond February 14, 1959 and in fact it is apparent that the parties intended the restriction to run only until that date.

(2) If the covenant was intended to run indefinitely beyond February 14, 1959, it is unenforceable because it would place an unreasonable restriction upon defendant.

(3) No injunction could be framed which would provide plaintiff with the results he asks without placing defendant under an intolerable and unreasonable burden.

Any one of these grounds would be sufficient in itself to deny plaintiff the relief sought.

In the light of all the foregoing, I deny plaintiff's application for an injunction, leaving him to whatever legal remedies may be available to him.

The foregoing will constitute the findings of fact and conclusions of law of the court under Rule 52, Federal Rules of Civil Procedure, 28 U.S.C.A.