**Lennox LEWIS, Plaintiff,**

v.

**Hasim RAHMAN, Don King Productions, Inc., Kingvision Pay Per View, Ltd., Don King, Robert Mittleman, Stanley Hoffman and Steve Nelson, Defendants.**

**Cedric Kushner Promotions, Ltd., Plaintiff,**

v.

**Hasim Rahman, Don King Productions, Inc., Kingvision Pay Per View, Ltd., and Don King, Defendants.**

**Nos. 01 Civ. 4013(MGC), 01 Civ. 4037(MGC).**

United States District Court, S.D. New York.

June 27, 2001.

Judd Burstein, P.C. (by Judd Burstein, Peter Schalk), New York City, for Plaintiff Lennox Lewis.

Greenberg Traurig, LLP (by Richard A. Edlin, Ronald D. Lefton, Gregory A. Brehm), New York City, for Plaintiff Cedric Kushner Promotions, Ltd.

Kirkpatrick & Lockhart LLP (by Michael F. Armstrong, John Sullivan, Mahtab Foroughi), New York City, for Defendant Hasim Rahman.

Curtis Mallet-Prevost, Colt & Mosle (by Peter Fleming, Jr., Ben Preziosi, Michael Quinn), New York City, for Defendants Don King Productions, Inc., Kingvision Pay Per View, Ltd. and Don King.

Andrew M. Lawler, P.C. (by Andrew M. Lawler, Sharon D. Feldman), New York City, for Defendants Stanley Hoffman and Steve Nelson.

## OPINION AND ORDER

CEDARBAUM, District Judge.

These two related suits arise out of contract disputes between Lennox Lewis, the former heavyweight champion of the world, and Hasim Rahman, the current heavyweight champion of the world, and between Rahman and his former promoter, Cedric Kushner Promotions, Ltd. ("CKP"). Plaintiffs Lewis and CKP sue Rahman for breach of contract and sue Don King Productions, Inc. ("DKP"), Rahman's current promoter, Kingvision Pay Per View, Ltd., and Don King (collectively the "King defendants") for tortious interference with contract. Lewis also sues Rahman's managers Stanley Hoffman and Steve Nelson, and Robert Mittleman for tortious interference with contract. Lewis claims a contractual right to fight a rematch against Rahman within 150 days of the April 21 bout in which Rahman defeated him. CKP claims that it has a continuing contractual right to promote Rahman in the rematch and for a period of two years from April 12, 2001.

With the consent of the parties, pursuant to Fed.R.Civ.P. 65(a)(2), and after the parties waived jury trial on all claims, the applications for preliminary and final injunctive relief were consolidated, and a bench trial was held on the merits of the equitable claims in both cases in accordance with Fed.R.Civ.P. 42(a) and 42(b). The damage claims in the two related cases will be tried on a date to be scheduled in October.

On June 21, 2001, following closing arguments by the parties, in open court, I enjoined Rahman from engaging in any other heavyweight bout for the next 18

months unless and until he honors his contractual obligation to fight a rematch with Lewis. Although I outlined the reasons for the injunction, I said that an opinion would follow on Lewis' claim for equitable relief and that of CKP.

## THE FACTS

After examining all of the evidence, observing the demeanor of the witnesses who testified in the courtroom, and considering the credibility and plausibility of all the testimony, I make the following findings of fact.

Since April 21, 2001, Hasim Rahman has held the heavyweight championship title of three of the four major sanctioning organizations that govern professional boxing: the World Boxing Council ("WBC"), the International Boxing Federation ("IBF") and the International Boxing Organization ("IBO"). Another boxer, John Ruiz, holds the heavyweight title of the World Boxing Association ("WBA"). Rahman is also the "linear" champion, a term used in the industry to describe the boxer whose championship can be traced back in a straight line to a single, undisputed champion. Rahman won these titles by defeating Lennox Lewis in a bout which took place in Johannesburg, South Africa.

CKP had been the exclusive promoter of Rahman since 1995. In June of 1998, CKP and Rahman entered into an Exclusive Promotional Agreement (the "Promotional Agreement"), for a two-year term commencing on October 12, 1998, pursuant to which Rahman granted to CKP "the exclusive worldwide rights to each of the bouts" promoted during the course of the agreement. The Promotional Agreement grants CKP an irrevocable option to extend the term of the agreement for another two years upon payment of $75,000 and provides for other automatic extensions of the

term. Paragraph 1(C) (the "championship provision") states:

> [i]n the event that FIGHTER is declared the Heavyweight World Champion of any or all of the WBA, WBC, or IBF, then the term of this agreement shall be extended, if necessary, to include FIGHTER's next four fights following his being declared Heavyweight World Champion.

Paragraph 16(b) (the "injury provision") states:

> [s]hould any bout scheduled to be promoted hereunder be postponed for any reason, or should FIGHTER be under temporary physical disability which results in the postponement of bouts scheduled, or to be scheduled, for FIGHTER by CKP pursuant to this Agreement, or should FIGHTER for any other reason be mentally or otherwise unable to engage in bouts (i.e., contractual disputes, legal problems or other matters).... the term of this Agreement and its extensions shall be extended for a period equal to the period of such postponement(s) or disability(s).

In addition, paragraph 19 provides, in relevant part, that CKP shall have a right of first refusal, a right to match any offer for Rahman's services, for a period of one year following the "termination" of the Promotional Agreement.

Lewis is promoted by Shogun Securities, Ltd. d/b/a Lion Promotions, Inc. ("Lion"), which he owns. Lewis' business manager, Adrian Ogun, runs the company on Lewis' behalf. Lion has an agreement with another company, Main Events, to co-promote certain of Lewis' bouts.

In December of 2000, Lion and CKP began negotiating for a bout between Lewis, who was then the world champion, and Rahman. Under the rules of the various sanctioning organizations, the champion is

required to defend his title in a bout with the number one contender, as determined by the respective sanctioning organization, at least once a year. In addition to these mandatory bouts, the champion may elect to fight other opponents in what are called voluntary defenses. Prior to the Lewis–Rahman bout, Rahman had lost two of his last four fights and was not highly ranked by any of the sanctioning organizations. The Lewis–Rahman bout was therefore a voluntary defense.

On January 31, 2001, Rahman signed a Bout Agreement with CKP to fight Lennox Lewis on April 21, 2001. The Bout Agreement requires CKP to provide $150,000 in training expenses in advance of the bout, including $25,000 already advanced, and a purse of $1,050,000.[1] One hundred thousand dollars of the training expenses were to be paid to Rahman upon execution of the Bout Agreement, but Rahman did not receive that money until after he signed the Addendum to the Bout Agreement, discussed below, two weeks later. Before signing the Bout Agreement, Rahman read it very slowly and discussed its terms with his manager, Hoffman.[2] Rahman was unhappy about the $25,000 deduction from the training expenses for funds already advanced, and wanted additional benefits for the bout, such as a larger number of hotel rooms and plane tickets. Hoffman communicated these objections to Kushner, and the issues were resolved favorably to Rahman, although the terms of the Bout Agreement were not changed in writing.

Shortly thereafter, Kushner, on behalf of CKP, signed a Provision of Services Agreement ("PSA"), pursuant to which CKP agreed to provide Rahman's services to Lion for the bout with Lewis, which Lion would promote. In the PSA, Lion agreed to pay CKP a total of $1,575,000—a $275,000 advance, with the remaining $1.3 million to follow after the bout—out of which CKP was to pay Rahman's purse and expenses.

Paragraph 7 of the PSA (the "rematch provision"), entitled "Exclusive Option for Rematch," states the following:

(a) As additional consideration for this agreement, CKP and CKP on behalf of Rahman covenant and agree that if Rahman is declared the winner of the Bout by the Boxing Commission having jurisdiction, [Lion] shall have the exclusive right and option, exercisable by written notice not later than thirty (30) days after the date of the Bout, to promote a rematch bout between Rahman and Lewis (the "Rematch").... within 150 days after the date of the Bout, upon the same terms and conditions as provided in this Agreement except that:

(i) in place of the fee payable pursuant to paragraph 1(c) hereof, [Lion] shall pay a fee to CKP of $3,150,000 (or such higher amount as may be mutually agreed upon) promptly after the conclusion of the Bout....

(b) From the sum set forth in paragraph 7(a)(i), CKP shall be responsible for payment of, and shall pay, Rahman's purse, training expense allowance, all applicable sanction fees and any and all

---

1. Rahman rejected two prior offers from CKP to fight Lewis pursuant to which Rahman would receive $1 million and $1.1 million, respectively, in purse and training expenses.

2. On August 31, 1999, Hoffman and Rahman had entered into a form Boxer–Manager Contract drafted by the New York State Athletic

Commission providing in part that "the Boxer agrees to faithfully fulfill any contract for the rendition of boxing services, including training, entered into on his or her behalf by the Manager." The term of that agreement is three years.

payments to or on behalf of Rahman for the Rematch.

(c) In the event that CKP or Rahman contemplates engaging in an interim bout prior to the Rematch with Lewis, then neither CKP nor Rahman shall enter into any contract for such bout unless that contract shall bind his challenger, in the event that challenger wins, to the same terms for a bout against Lewis as set forth in paragraphs 7(a) and 7(b) herein and, provided further, that such interim bout may not be held within 90 days of the date scheduled for the Rematch. The contract for the interim bout must contain an addendum which shall be a direct contract between Promoter and the challenger and which must contain the terms required in this paragraph 7.

The PSA further provided in paragraph 1(c) that Lion's payment of the $275,000 advance to CKP was conditioned on CKP's delivery of a binding agreement from Rahman in which he agrees to participate in the Lewis–Rahman bout upon the terms and conditions provided in the PSA and to grant Lion, its associates, partners or assignees a direct cause of action against Rahman for any breach of his obligations under the Addendum. Lion did not sign the PSA until after this additional agreement was executed by Rahman.

On February 13, 2001, Kushner gave an Addendum to Bout Agreement ("Addendum"), drafted by Lion's counsel, to Hoffman for Rahman to sign. At the time, Rahman was training for the Lewis bout in upstate New York. Rahman signed the Addendum on February 14, 2001. The Addendum provides that Lion, Lewis and their designees are third party beneficiaries of the Bout Agreement and have a right to proceed against Rahman for a breach of the Bout Agreement or the Addendum. Paragraph 5 states that "Fight-er hereby acknowledges that Promoter has all rights necessary to comply with the agreement which it is about to enter with Lion Promotions or its designee(s) which will provide for the promotion of the bout and certain future rights." Paragraph 7 states that "[i]f Fighter is declared the winner of the bout by the applicable boxing commission, he agrees to participate in a rematch within 150 days of the date of the bout upon the terms and conditions that may be negotiated by promoter."

I do not credit Hoffman's claim that he knew nothing about the rematch provision of the PSA at the time Kushner gave him the Addendum. He testified that he was aware that the agreement for the rematch permitted an interim bout. Hoffman further testified that he was not concerned about the terms of the rematch provision because he believed they could be dealt with when Rahman became the champion. In contrast, Kushner testified that he kept Hoffman informed of the major terms of the PSA during the course of negotiations with Lion and showed him the final version of the PSA on February 13.

Hoffman knew that paragraph 5 of the Addendum referred to the PSA. Hoffman admitted being aware, at the time he received the Addendum, that Kushner and Lion were negotiating an agreement for the Lewis–Rahman bout, and that as part of that agreement CKP would receive $1,575,000 for providing Rahman's services. I do not credit his testimony that he believed the agreement referred to in paragraph 5 was the Bout Agreement. The Bout Agreement, to which Lion was not a party, had already been executed by the time the Addendum was presented to Hoffman and Rahman. The Bout Agreement could not have been understood to be the agreement that CKP was "about to enter" with Lion.

Hoffman brought the Addendum to Rahman. Rahman read and signed the Addendum on February 14, 2001. Hoffman brought the signed Addendum back to Kushner, who forwarded it to Lion. After Lion received the Addendum, it signed the PSA and forwarded the $275,000 advance payment to Kushner as required by the PSA.

The expiration date of CKP's Promotional Agreement with Rahman was October 12, 2000. That agreement, however, provided for an automatic extension in the event that Rahman was injured. Although in January of 2001, Rahman had told several people, including Don King, that he was a free agent, it appears that the parties were negotiating for the Lewis bout on the understanding that the term of the Promotional Agreement had been extended as result of injuries to Rahman. Rahman was injured for approximately nine months during the term of the Promotional Agreement. Those injuries required two bouts to be postponed for a total of roughly six months. The parties agreed in a letter from CKP to Rahman dated March 16, 2001, which was signed by Kushner and countersigned by Rahman, that the Promotional Agreement had been extended due to Rahman's injuries "for a total of sixth months" until April 12, 2001.

On or about March 20, 2001, approximately a week before Rahman and Hoffman traveled to South Africa to prepare for the bout, Kushner and Hoffman had a conversation in which they discussed payment of Rahman's purse. The custom and practice in the boxing industry is for fighters to be paid the purse immediately after the bout. However, because Hoffman did not want to deal with money in South Africa, he agreed to receive the purse check at Kushner's office in New York on April 24, after they returned from South Africa. Kushner testified that during this conversation, he mentioned to Hoffman that $75,000 was due, apparently referring to the $75,000 payment required for the exercise of CKP's two-year extension option. According to Kushner, Hoffman instructed him to pay it together with the purse after they returned from South Africa. Hoffman did not recall that part of the conversation.

Although Lewis was heavily favored, Rahman defeated him in the Johannesburg bout, thereby becoming the WBC, IBF, IBO and linear heavyweight champion. Upon Kushner's return from South Africa, on the morning of April 24, he contacted Hoffman and arranged to meet Hoffman to give him the monies due to Rahman from the Lewis bout. Kushner gave Hoffman several checks, including a check for $75,000. Hoffman signed a two-page letter, drafted by CKP, acknowledging receipt of the payments. The receipt stated that "in full satisfaction of CKP's obligations relating to the extension of the term of the June 17, 1998 EPA under the provisions of paragraph 1 of that agreement, enclosed herewith is CKP's check ... in the amount of $75,000." Hoffman signed immediately below the following statement at the bottom of the second page: "This will acknowledge receipt and acknowledgment of the above-mentioned items. Stan Hoffman for Hasim Rahman."

Kushner and Hoffman then traveled to Baltimore, Rahman's hometown, to attend a rally in his honor. At a party following the rally, Hoffman gave Rahman the checks he had received from Kushner. Rahman refused to take the check for the $75,000 extension payment, although neither he nor Hoffman told Kushner that he was rejecting it. In fact, Rahman publicly stated that CKP was his promoter on several occasions both on April 24 and over the following two weeks. The $75,000

check has been neither cashed nor returned to Kushner.

Also on April 24, Lion notified CKP that it was exercising its rematch option and set August 18, 2001 as the date for the rematch.

Thereafter, CKP engaged in negotiations with HBO and Showtime for Rahman's future bouts. A deal with HBO was reached in early May of 2001, pursuant to which CKP would receive over $14 million for the rematch with Lewis. As part of the deal, CKP would pay Rahman approximately $13 million for participating in the rematch. The deal also gave HBO rights to future fights; it offered the possibility that Rahman could earn more than $120 million if he continued to defend his championship successfully, and guaranteed a minimum of more than $17 million to Rahman even if he were to lose to Lewis in the rematch. The deal fell through when HBO failed to present a check for a $3 million signing bonus to Rahman as had been agreed.

On the evening of May 9, 2001, Rahman and Hoffman met with King in King's hotel room in New York. King offered Rahman an Exclusive Promotional Agreement (the "King agreement"). The King agreement promised a signing bonus to Rahman of $5 million. It also provided that Rahman's first bout would be against Brian Nielsen on August 4, 2001, and that his second bout would be a "unification bout" against the WBA champion. The winner of that bout would hold the heavyweight title of all four sanctioning organizations. Rahman signed the King agreement, and King gave him $200,000 in cash and a check for $4.8 million. After Rahman signed the King agreement, his opponent in the August 4, 2001 bout was changed from Nielsen to David Izon. Rahman has not yet signed a Bout Agreement to fight Izon.

Lennox Lewis was an extremely credible witness. He testified that he has been a boxer since the age of 12. He fought in over 300 amateur fights before turning professional at age 23. He represented Canada in the 1984 and 1988 Olympic Games. In 1998, he won the Olympic gold medal for boxing. He has fought 36 professional bouts. Prior to the loss to Rahman, Lewis had lost only one professional fight. Lewis described the rigorous training program he undertakes to prepare for each fight, as well as the physical risks he assumes when he boxes. He testified that it was a material condition of his bout with Rahman that Rahman agree to a prompt rematch if he won the bout. Lewis wants an immediate rematch both because of his age and because he fears that other boxers will try to freeze him out of title contention. He will be 36 years old this fall.

Emmanuel Steward, Lewis' manager and trainer, was also a very credible witness. He testified that Lewis is reaching the age at which a boxer's skills begin to diminish. Steward testified that Lewis has fought longer and more often than most heavyweight boxers, especially champions, and has suffered even more wear and tear than other boxers his age. He further testified that Lewis needs to fight three or four times a year to maintain his weight and keep his skills sharp. Because of his age and the relatively large number of fights he has fought in his amateur and professional careers, Lewis plans to retire in two years.

I find that Lewis would suffer irreparable harm were he denied the opportunity to regain his championship title. It is undisputed that the heavyweight championship is the most prestigious title in professional boxing. The opportunity to fight for the heavyweight championship, and especially the opportunity to regain the championship, cannot be measured in mon-

ey. Because of his age, Lewis has only a limited time to regain his title and restore his reputation. Rahman, in contrast, is only 28 years old. Even if he chose not to box for 18 months, he would still have several productive years left in his career. Rahman concedes that he has a contractual obligation to fight Lewis in a rematch eventually, although he prefers to fight an interim bout. When asked if he wished to fight Lewis immediately, he said, "I don't have a problem with it."

Shelly Finkel, Mike Tyson's boxing manager, William Kozerski, a promoter who promoted Michael Moorer when he was the heavyweight champion, and Kushner all testified that the exclusive promoter of the heavyweight champion has business opportunities that other promoters do not have. These include being able to negotiate more fight cards [3] with cable television broadcasters, increased visibility, and prestige, major advantages in recruiting new fighters and promoting other fighters more successfully.

## DISCUSSION

### Lewis' Claim

■ Lewis has a right to a rematch on August 18, 2001 under the terms and conditions of the PSA. Lewis is a third party beneficiary of the Addendum. By signing the Addendum, Rahman expressly agreed to fight Lewis in a rematch within 150 days. The other terms of the contract, including the price term,[4] are supplied by the PSA, which is incorporated by reference by paragraph 5 of the Addendum. Under New York law "a paper referred to in a written instrument and sufficiently described may be made part of the instrument as if incorporated into the body of it." *Jones v. Cunard S.S. Co.*, 238 A.D. 172, 263 N.Y.S. 769, 771 (2d Dep't 1933). The paper to be incorporated must be clearly identified in the contract so that it is clear beyond a reasonable doubt. *Chiacchia v. Nat'l Westminster Bank USA*, 124 A.D.2d 626, 507 N.Y.S.2d 888, 889–90 (2d Dep't 1986). The reference to the PSA in paragraph 5 of the Addendum is clear beyond a reasonable doubt. Hoffman admitted that he knew that Lion and CKP were negotiating an agreement to provide Rahman's services. The PSA is the only agreement between CKP and Lion that was signed by Lion after the Addendum was executed.

■ Defendants' fraudulent inducement defense fails. A contract may be voided if it is induced by fraud, as where "one party possesses superior knowledge, not readily available to the other, and knows the other is acting on the basis of mistaken knowledge." *Brass v. American Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir.1993). There is no evidence that the terms of the rematch provision were not readily available to Hoffman and Rahman. It is clear on the face of the Addendum that Rahman was agreeing to 1) a rematch within 150 days, 2) the terms of the PSA and 3) the grant of certain future rights to Lion. Rahman's and Hoffman's failure to ask Kushner questions about paragraphs 5 and 7 of the Addendum, even if believed, does not show fraud on the part of CKP or Lion.

Defendants' other arguments—that the WBC rule against immediate rematches and the Muhammad Ali Boxing Reform Act (the "Ali Act"), 15 U.S.C. §§ 6301 *et seq.* invalidate essential terms of the rematch provision—are equally without merit. Violation of the WBC's rule may cause

---

**3.** A fight card is a series of bouts in a single night that are shown as a single package.

**4.** The PSA provides that a minimum of $3.15 million be paid to CKP, who is responsible for paying Rahman's purse.

the WBC to refuse to sanction the Lewis–Rahman rematch. WBC sanction, however, is not required by the PSA, the Bout Agreement or the Addendum. Moreover, only Lewis, and not Rahman, can be harmed by the withholding of the WBC sanction. Whether or not the bout is sanctioned, if Rahman should win the rematch, he would keep all the titles; if he should lose, he would lose all the titles.

The rematch provision contains a requirement that Rahman, should he wish to engage in an interim bout, obtain an agreement from the his opponent that, in the event that opponent wins the interim bout, he will fight Lewis in a bout promoted by Lion. Defendants contend that this requirement is unenforceable under the Ali Act and invalidates the entire rematch provision. *See* 15 U.S.C. § 6307b(a)(1)(A)(ii) (stating that a coercive provision is unenforceable when the other boxer under contract is also subject to a coercive provision).[5] I need not decide whether the provision in question violates the Ali Act because there is no evidence that Rahman tried to arrange an interim bout within the time stipulated in the PSA. The question is therefore not presented. Moreover, even if the clause were unlawful, it could be severed pursuant to the severability clause in paragraph 11 of the PSA.

■ Neither the Addendum nor the PSA contains an express negative covenant pursuant to which Rahman agreed not to fight anyone else before he fights the rematch. But, under New York law, a negative covenant will be implied where the party from whom performance is sought is a unique and extraordinary tal-

ent. *Harry Rogers Theatrical Enterprises, Inc. v. Comstock*, 225 A.D. 34, 232 N.Y.S. 1, 4 (1st Dep't 1928). Rahman holds the heavyweight championship title. He is therefore both unique and extraordinary.

### CKP's Claim

The Promotional Agreement, on its face, expired on October 12, 2000. CKP and Rahman extended the term to April 12, 2001. Although CKP held an irrevocable option to renew the Promotional Agreement, it did not pay the $75,000 option price until April 24, two weeks after the agreement had expired. CKP nevertheless argues that it has the exclusive right to promote Rahman.

#### Authorization for Late Payment

■ CKP argues that Kushner exercised CKP's renewal option during a conversation with Hoffman on or about March 20, 2001, and that Hoffman requested that Kushner wait until they returned from South Africa to pay the $75,000. Hoffman was authorized to contract on Rahman's behalf without consultation. The Boxer–Manager Contract binds Rahman to "any contract for the rendition of boxing services" entered into by Hoffman on his behalf. The Promotional Agreement is such a contract. Shelly Finkel, an experienced manager with no ties to either party, testified credibly that managers are customarily authorized to enter contracts on behalf of the boxers they manage without consultation, although many managers, including himself, consult their boxers whenever possible. Although Hoffman had the authority to extend CKP's time to

---

**5.** The Ali Act defines a coercive provision as: a contract provision that grants any rights between a boxer and a promoter, or between promoters with respect to a boxer, if the boxer is required to grant such rights, or a boxer's promoter is required to grant such rights with respect to a boxer to another promoter, as a condition precedent to the boxer's participation in a professional boxing match against another boxer who is under contract to the promoter.
15 U.S.C. § 6307b(a)(1)(B).

pay the $75,000 option price, the alleged discussion about the $75,000, which Hoffman does not remember, is insufficient to do so.

■■ Where, as here, the contract to be modified provides that all modifications must be in writing, a purported oral modification violates the Statute of Frauds. N.Y. Gen. Oblig. L. § 15–301(1); *Tierney v. Capricorn Investors, L.P.,* 189 A.D.2d 629, 592 N.Y.S.2d 700, 703 (1st Dep't 1993). Partial performance may excuse the writing requirement, but only when such performance is "unequivocally referable" to the purported oral modification. *Rose v. Spa Realty Assoc.,* 42 N.Y.2d 338, 343–44, 397 N.Y.S.2d 922, 366 N.E.2d 1279 (N.Y. 1977). But neither CKP's untimely tender of the $75,000 check nor the accompanying acknowledgment letter contains any reference to the alleged March 20 conversation to confirm the purported oral modification. Further, Rahman is not estopped by his conduct after the Johannesburg bout because there is no evidence that CKP acted in reliance on the extension of the Agreement. *See id.* To the contrary, there is testimony by Hoffman that the parties were negotiating a new promotional agreement between CKP and Rahman while the negotiations with HBO were taking place.

■ Assuming that timely payment of $75,000 was a condition rather than a contractual duty, the alleged discussion was also too vague to constitute a waiver. Under New York law, a "waiver requires proof of voluntary and intentional relinquishment of known and otherwise enforceable right." *Peck v. Peck,* 232 A.D.2d 540, 649 N.Y.S.2d 22, 23 (2d Dep't 1996). According to Kushner's testimony, he "mentioned to [Hoffman] that there was $75,000 due." He did not refer to the renewal option, nor express his intention to exercise it. It is not clear from the context that Hoffman understood that

Kushner was talking about the option. Especially when the right which is alleged to have been waived is so significant, the inference of a waiver must be clear. *See Ess & Vee Acoustical & Lathing Contractors, Inc. v. Prato Verde, Inc.,* 268 A.D.2d 332, 702 N.Y.S.2d 38, 39 (1st Dep't 2000) (inference of waiver should not be drawn from a doubtful or equivocal act).

Similarly, Hoffman's receipt of the check and signing of the acknowledgment did not excuse CKP's untimely performance or demonstrate a knowing and voluntary waiver. After the Promotional Agreement expired, something more than the mere receipt of a check is necessary to revive and extend it. An express waiver of timeliness and a clear intention to extend the Promotional Agreement for 2 years is required.

### Injury Extension

CKP argues that, the March 16 letter notwithstanding, the injury provision extends the term of the Promotional Agreement until at least June. Rahman testified that he was injured for at least 247 days during the term of the Promotional Agreement. Therefore, CKP argues, the Promotional Agreement was extended from October 12, 2000 to June 15, 2001, making Kushner's tender of the $75,000 timely. Rahman disagrees. On his reading of the injury provision, the agreement is extended only during the time that a bout is postponed because of an injury. Not all of Rahman's injuries resulted in postponements. Rahman's injuries resulted in the postponement of two bouts for a combined total of approximately six months. The parties agreed in the March 16 letter that the length of the injury extension was six months. "The parties' interpretation of the contract in practice, prior to litigation, is compelling evidence of the parties' intent." *Freedberg v. Landman,* 930 F.Supp. 851, 855 (E.D.N.Y.1996). More-

over, it is a reasonable reading of the plain meaning of the agreement.

### The Championship Provision

The championship provision cannot extend the term of the Promotional Agreement. The Agreement expired on April 12, 2001, nearly two weeks before Rahman's victory in Johannesburg. It was no longer in effect when Rahman became heavyweight champion. By its terms, the championship provision only extends the term of the Agreement, it does not create a new term once the original term has expired.

### The Right of First Refusal

CKP claims the right to match the terms of the King agreement. Paragraph 19 of the Promotional Agreement provides that CKP has the right to match any offer to promote Rahman made within one year of the "termination" of the Promotional Agreement or the "expiration" of the exclusive negotiating period. Paragraphs 16 and 18 give CKP the express power to terminate the Agreement if Rahman becomes disabled or loses a bout. In addition to terminating the agreement, CKP may exercise an option to declare a 45–day exclusive negotiation period after the date of termination. CKP argues that, in the context of the right of first refusal provision, termination of the Agreement includes its expiration.

■ The expiration of the agreement did not trigger CKP's right of first refusal. Rights of first refusal are construed narrowly under New York law. *Globe Slicing Mach. Co. v. Hasner,* 333 F.2d 413, 415 (2d Cir.1964), *cert. denied,* 379 U.S. 969, 85 S.Ct. 666, 13 L.Ed.2d 562 (1965). Moreover, since the contract uses "expiration" when referring to the lapse of the exclusive negotiating period, and "terminate" when referring to CKP's rights to affirmatively end the agreement under

paragraphs 16 and 18, it is clear that "termination" in the right of first refusal provision refers only to CKP's exercise of its rights to affirmatively end the agreement. *See Hawes Office Systems, Inc. v. Wang Laboratories, Inc.,* 524 F.Supp. 610, 614 (E.D.N.Y.1981) (where contract distinguished expiration for non-renewal from termination for non-performance, use of "terminate" in the addendum to the contract held only to refer to the latter).

### CKP's Rights to the Rematch Under the Addendum

Under the Addendum and the PSA, CKP has the exclusive right to promote Rahman in the rematch. Paragraph 7 of the Addendum designates CKP as the promoter of the rematch. As discussed above, the Addendum also incorporates by reference the terms of the PSA and the rematch provision in particular. Under the rematch provision, CKP has the right to receive $3.15 million, or such amounts as may be mutually agreed upon, from Lion for delivering Rahman's services in the rematch. CKP also has the obligation to pay Rahman's purse and expenses in the rematch.

There is no express negative covenant in either the Addendum or the PSA that prohibits Rahman from fighting the rematch for another promoter, but since Rahman, as the heavyweight champion of the world, is a unique and extraordinary performer, a negative covenant is implied. *Comstock,* 232 N.Y.S. at 4. Moreover, Rahman's rematch obligation is part of a series of agreements with CKP.

### Injunctive Relief
### LEWIS

Several courts have granted equitable relief to enforce negative covenants where, as here, the party to be enjoined is a unique and extraordinary boxing talent. *Madison Square Garden Corp. v. Carnera,*

52 F.2d 47 (2d Cir.1931); *Madison Square Garden Boxing, Inc. v. Shavers*, 434 F.Supp. 449 (S.D.N.Y.1977); *Arias v. Solis*, 754 F.Supp. 290 (S.D.N.Y.1991); *but see Machen v. Johansson*, 174 F.Supp. 522 (S.D.N.Y.1959).

■ "The basic requirements to obtain injunctive relief have always been a showing of irreparable injury and the inadequacy of legal remedies." *Ticor Title Insurance Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir.1999). Lewis would be irreparably harmed if he were denied the opportunity to regain the championship. The value of the opportunity to regain the heavyweight championship while he still has the ability to do so cannot be measured or compensated for in money damages.

In contrast, an injunction will not impose a significant burden on Rahman. Rahman concedes that he has an obligation to fight a rematch with Lewis eventually, and he testified that he does not have a problem fighting the rematch first. Moreover, the evidence at trial demonstrates that Rahman will earn several million dollars in a rematch bout. The potential harm to Lewis should injunctive relief be denied greatly outweighs the relatively minor burden the injunction imposes on Rahman.

Defendants, in their post-trial submissions, now argue that lack of mutuality precludes injunctive relief. *See Lawrence v. Dixey*, 119 A.D. 295, 104 N.Y.S. 516 (1st Dep't 1907). This argument is unavailing.

Lion has exercised its option under the rematch provision, binding itself and Lewis to fight the rematch on the terms described in the PSA and to negotiate in good faith for a purse that exceeds the stipulated minimum. The *Lawrence* doctrine is, therefore, inapplicable.

A preponderance of the credible evidence shows that Lewis will not be able to fight for more than the next two years. Even during the next two years, his boxing abilities may diminish. An injunction for 18 months provides an effective remedy for Lewis' irreparable harm and does not unfairly impede Rahman. *Cf. Machen*, 174 F.Supp. at 529–531 (denying injunctive relief based on the finding that a limited injunction would be ineffective and an indefinite injunction would unduly burden the defendant).[6] If I were to limit the injunction to 150 days, as Rahman urges, I would be permitting Rahman to escape his obligation by letting a short period of time elapse. As soon as Rahman complies with his obligation, he will be free to fight other bouts. The power to end the restriction is in his hands.

### CKP

■ In most of the cases in which negative covenants have been specifically enforced, the defendant owed a continuing obligation to the plaintiff for a specific term. *But see Madison Square Garden Boxing, Inc. v. Shavers*, 434 F.Supp. 449.[7]

6. *Machen* did not involve a right to fight to regain the heavyweight championship. Accordingly, Eddie Machen's interest in fighting a rematch with the defendant, and the harm resulting from the loss of that opportunity, were not comparable to Lewis' injury.

7. In *Shavers*, Madison Square Garden had an agreement with Eddie Shavers to fight Muhammad Ali for a guaranteed purse of $200,000. The Garden had widely marketed the fight and contracted with NBC to televise

it. The court found that the harm to the Garden's reputation and credibility if Shavers were to disavow his contract with impunity was irreparable. *Id.* at 52. Those considerations are less significant here, where the television and marketing arrangements have yet to be made. Moreover, the Garden's performance consisted only of paying Shaver's purse. In this case, CKP would be responsible for negotiating on Rahman's behalf for a television deal and for a higher fee from Lion.

In those cases, the financial loss to the plaintiff over the term of the contract that would result from a breach was difficult to calculate. In this case, CKP's exclusive right to promote Rahman extends to only a single fight. The loss resulting from a breach by Rahman can be measured in money. It is the percentage of Rahman's purse that CKP would have received had it been Rahman's promoter.

Several witnesses testified credibly that, in addition to higher purses, the exclusive promoter of the heavyweight champion has access to business opportunities that other promoters do not have. The value of those business opportunities is usually incapable of ascertainment. Those opportunities generally arise in circumstance in which the promoter has continuing rights in the fighter. CKP did not present evidence that the right to promote a champion boxer in a single bout, as distinguished from being that boxer's exclusive promoter for all bouts, carries the same reputational benefits. The harm to CKP from Rahman's breach of his rematch obligations to CKP under the Addendum and the PSA is compensable in money. Accordingly, CKP's request for injunctive relief is denied.

## CONCLUSION

The foregoing Opinion constitutes my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). Defendant Hasim Rahman is hereby enjoined from engaging in any heavyweight bout for the next 18 months unless and until he complies with his contractual obligation to fight a rematch with Lennox Lewis under the terms and conditions of the Provision of Services Agreement. CKP's prayer for

In this type of relationship, enforcement of the negative covenant could require significant court supervision and is disfavored. *See Bethlehem Engineering Export Co. v. Christie,*

an injunction is denied. CKP's claims for damages will be tried with the other legal claims in these two related cases on a date to be scheduled in October.

SO ORDERED.

### ORDER

On June 12, 2001, I granted the application of Shogun Securities Limited, d/b/a Lion Promotions to withdraw as a plaintiff in this action in order to preserve subject matter jurisdiction. Accordingly, the Clerk is directed to delete Shogun Securities Limited, d/b/a Lion Promotions from the caption.

SO ORDERED.

105 F.2d 933, 935 (2d Cir.1939) (denying specific enforcement of negative covenant where it would require "the continuous or repeated supervision of the court").